**AMERICAN BRANDS, INC., Plaintiff,**

v.

**R. J. REYNOLDS TOBACCO COMPANY and LKP International Ltd., d/b/a Leber Katz Partners, Defendants.**

No. 76 Civ. 762.

United States District Court, S. D. New York.

June 2, 1976.

Chadbourne, Parke, Whiteside & Wolff, New York City, for plaintiff; Paul G. Pennoyer, Jr., Daniel J. O'Neil, Charles S. Tusa, Thomas E. Bezanson, Thomas A. Dubbs, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendant R. J. Reynolds Tobacco Co.; Richard E. Nolan, Hiram D. Gordon, Carolyn Lewis Ziegler, Brooklyn, N. Y., of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendant LKP International, Ltd., Gary J. Cohan, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

American Brands, Inc., (American) brought this action February 17, 1976 against R. J. Reynolds Tobacco Company (Reynolds) and LKP International Ltd. (Reynolds' advertising agency) for alleged violations of the Lanham Act, 15 U.S.C. § 1125(a) and the laws of the State of New York. Jurisdiction is predicated on 15 U.S.C. § 1121, 28 U.S.C. § 1338(a) and (b), and the doctrine of pendant jurisdiction.

At the time suit was commenced, American claimed that Reynolds' advertising of its "NOW" 2 mg tar cigarettes which then stated "Now. The lowest 'tar' of all cigarettes" was false because for many years prior to the institution of this action, American had manufactured and distributed CARLTON 70's, a 1 mg tar cigarette, lower by definition in tar and nicotine content than NOW; and on February 2nd and February 16th, respectively, had commenced the distribution of its CARLTON 2 mg. menthol and filter king cigarettes. American sought a preliminary and permanent injunction prohibiting Reynolds from continuing to use the quoted language in advertising.

During the course of the litigation and, according to Reynolds, because of the wider marketing by American of its CARLTON 70's, (which American admits it had distributed only on a test basis until December 1975), Reynolds has discontinued (with exceptions noted below) the use of the original advertisement. Instead it has substituted the text "Now. 2 mg 'tar' is lowest (king-size or longer)." to be used in the areas in which it has concluded that CARLTON 70's, which are only 70 mm. in length, are distributed on a "more than insignificant" basis. In other areas its advertisement presently reads "Now. 2 mg 'tar' is lowest" without the qualifier referring to king and longer sizes. Because of the change in Reynolds' advertising, American filed an amended complaint on March 15th which alleges that the new Reynolds advertisement is false 1) in relation to CARLTON 70's because the 70's continue to be lower in tar and nicotine content than NOW cigarettes and 2) in relation to CARLTON 83 mm. menthols and filter kings because, American claims, the use of the word "lowest" in the NOW advertising implies that NOW cigarettes are lower in tar content than the 83's when, in fact, each is at the 2 mg level.

In their answers, Reynolds and LKP deny the allegations of the complaint, deny that the Lanham Act is applicable in the circumstances alleged in the complaint, and assert that since Reynolds and American are both New Jersey corporations and no federal question exists, this court lacks jurisdiction of the subject matter. In addition, Reynolds asserts a counterclaim against American alleging that American's advertising is false and misleading because its claim that the CARLTON 2 mg cigarette is the "fastest growing of the top 25" brands is false, and CARLTON's promotion and distribution of its new 2 mg menthol and filter kings interchangeably with the predecessor 4 mg cigarettes is deceptive and tends to confuse since these two cigarettes are substantially different from each other. Moreover, during the course of the trial and in its proposed findings of fact, Reynolds has also submitted evidence and asserts (presumably moving by implication that its counterclaim be amended accordingly) that American's advertisements of its CARLTON 70's are false and deceptive because, to use Reynolds' words, they are "designed to prevent the consumer from appreciating the shorter length of CARLTON 70's by showing a picture of the package at an angle" allegedly creating and intended to create the impression that the cigarette is larger than shown. (Reynolds' Proposed Findings of Fact 103)

Finally, Reynolds also asserts (although the claim was not pleaded) that a particular advertisement of CARLTON which lists the tar content of cigarettes other than CARLTON, but which does not include the tar content of NOW cigarettes is false and misleading because it creates the impression that there is no other cigarette with as low a tar content as CARLTON 2's whereas, in

fact, NOW's content is as low. Reynolds' counterclaim seeks a preliminary and final injunction against American to stop the allegedly false CARLTON advertising.

Hearings on the motions for preliminary injunction were merged into a full trial pursuant to Rule 65 of the Federal Rules of Civil Procedure.

Because of the fluidity of the situation and the claim by both sides that the impact of each day's advertising may be significant, and that an early ruling was therefore of special importance, this decision was delivered from the bench rather than in a formal opinion. This memorandum contains the substance of the oral opinion, which included the court's findings of fact and conclusions of law. There are set forth in this decision only those facts which are relevant and necessarily must be considered to reach a determination under applicable law. The discussion does not purport to review the entire history of the development of CARLTON 70's, CARLTON 4 mg's, CARLTON 2 mg's, NOW cigarettes, the dynamics of the promotion of cigarettes, the relation of the parties or other matters which may be regarded as relevant, but consideration of which is not necessary in reaching a decision on the merits of the complaint or counterclaim.

## I.

### Jurisdiction

Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) reads as follows:

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used,

shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 15 U.S.C. § 1125(a).

■ Reynolds asserts that American's complaint fails to state a claim under the Lanham Act. It argues that Congress never intended the Act to apply to claims of false advertising such as asserted by American in which the defendant is not charged with misappropriating the name or distinctive features of the plaintiff's product. Reynolds asserts that the sole purpose of the Lanham Act, as established by court decision and legislative history, was to deal with claims of false advertising that are "analogous to the misappropriation or misuse of trade names or trademarks." *Geisel v. Poynter Products Inc.*, 283 F.Supp. 261, 267 (S.D.N.Y.1968). We agree with Reynolds that protection against such wrongs was a major purpose of the Act and that most cases brought under the Lanham Act do relate to palming off and misappropriation of trademarks. Indeed, few have been brought to our attention which deal with false advertising and none which deal with claims such as made here by American. Nevertheless, we believe that the complaint states a claim under the Act and that accordingly this court has jurisdiction of the subject matter.

■ The starting point for any such determination must be the language of the Act itself, which in relevant part provides: " . . . any person who shall . . . use in connection with any goods . . . any false description or representation, including words or other symbols tending falsely to describe or represent the same, . . . and shall cause such goods . . . to enter into commerce, and any person who shall with knowledge of the falsity of such . . . description or representation cause or procure the same to be transported or used in commerce . . . shall be liable to a civil

action by any person . . . who believes that he is or is likely to be damaged by the use of any such false description or representation."

These words on their face apply to a case of false advertising. This construction is supported by the language of the Third Circuit Court of Appeals in the seminal and early decision of *L'Aiglon Apparel v. Lana Lobell Inc.*, 214 F.2d 649 (3rd Cir. 1954), where, in reference to the statute the court declared:

"Congress has defined a statutory civil wrong of false representation of goods in commerce and has given a broad class of suitors injured or likely to be injured by such wrong the right to relief in the federal courts. This statutory tort is defined in language which differentiates it in some particulars from similar wrongs which have developed and have become defined in the judge made law of unfair competition. Perhaps this statutory tort bears closest resemblance to the already noted tort of false advertising to the detriment of a competitor, as formulated by the American Law Institute out of materials of the evolving common law of unfair competition. . . . But however similar to or different from preexisting law, here is a provision of a federal statute which, with clarity and precision adequate for judicial administration, creates and defines rights and duties and provides for their vindication in the federal courts." 214 F.2d at 651 (citation omitted).

This language has been cited with approval by the Second Circuit on several occasions. See *Fur Information & Fashion Council, Inc. v. E. F. Timme & Son, Inc.*, 501 F.2d 1048 (2d Cir. 1974); *Alfred Dunhill Limited v. Interstate Cigar Company, Inc.*, 499 F.2d 232, 236 (2d Cir. 1974); *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 692 (2d Cir. 1971). From these cases, and particularly the Court's discussion of the purpose and policy behind the statute in *Colligan v. Activities Club of New York, Ltd.*, supra, 442 F.2d at 691–94, we conclude that jurisdiction exists both with regard to the complaint and the counterclaim.

## II.

*Reynolds' Advertising*

As we have indicated, Reynolds has altered its advertising since the inception of this litigation from "Now. Lowest 'tar' of all cigarettes" to "Now. 2 mg 'tar' is the lowest" and "Now. 2 mg 'tar' is the lowest (king size or longer)". Accordingly, with the exception of the limited instances in which the original message is still being disseminated, we deal solely with the question whether the new message violates the Act.

The cases make clear, and the parties do not dispute that to obtain injunctive relief under the Act, it is sufficient to establish a likelihood of confusion or tendency to mislead. *Hesmer Foods, Inc. v. Campbell Soup Company*, 346 F.2d 356, 359 (7th Cir. 1965); *Parkway Baking Company v. Freihofer Baking Company*, 255 F.2d 641, 649 (3rd Cir. 1958); *Geisel v. Poynter Products, Inc.*, supra, 283 F.Supp. 261, 268 (S.D.N.Y.1968).

### A. The Impact of the NOW Advertisements on the CARLTON 83 mm Menthol and Filter Kings

The amended complaint alleges that the advertisement "Now. 2 mg 'tar' is lowest" has a tendency to mislead and deceive because it implies that no other cigarette has only 2 mg tar when, in fact, the CARLTON 83 mm. menthol and filter kings are of equally low tar content.

■ Deceptive advertising or merchandising statements may be judged in various ways. If a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or consumer of the product. Again, even where the defendant's trademark or trade name does not actually duplicate the plaintiff's, if there is such a substantial similarity between the plaintiff's mark or name and the defendant's that the likelihood of confusion must necessarily follow, a court can grant relief on its own findings without recourse to a survey of consumer reaction.

■ The subject matter here is different. We are dealing not with statements which are literally or grammatically untrue; and the tendency to deceive alleged here does not arise out of possible confusion of one product with another. Rather, we are asked to determine whether a statement acknowledged to be literally true and grammatically correct nevertheless has a tendency to mislead, confuse or deceive. As to such a proposition "the public's reaction to [the] advertisement will be the starting point in any discussion of the likelihood of deception. . . . If an advertisement is designed to impress . . . customers, . . . the reaction of [that] group[s] will be determinative." 1 Callman: Unfair Competition, Trademarks & Monopolies at § 19.2(a)(1) (3rd ed. 1967). A court may, of course, construe and parse the language of the advertisement. It may have personal reactions as to the defensibility or indefensibility of the deliberately manipulated words. It may conclude that the language is far from candid and would never pass muster under tests otherwise applied—for example, the Securities Acts' injunction that "thou shalt disclose"; but the court's reaction is at best not determinative and at worst irrelevant. The question in such cases is—what does the person to whom the advertisement is addressed find to be the message?: Does the advertisement in question, the assertion "Now. 2 mg 'tar' is lowest" lead him to believe that Reynolds exclusively claims that no other cigarette is as low or lower in tar content? The fatal defect of both the American and Reynolds cases is that in neither instance has any evidence of substance been submitted which establishes the "determinative" reaction of the consumer to the respective advertisements. The sole evidence submitted by American as to customer reaction to the NOW advertisements was that of David Doer, its Section Sales Manager in the Pennsylvania, New Jersey and Delaware territories, who testified to three or four conversations with NOW buyers who appear to have been confused by NOW advertisements. Putting aside the fact that such statements were reported on a hearsay basis, one can hardly regard the report of three or four casual conversations with smokers as representative of the views of the millions of smokers by whom NOW's advertisements are read. On the record before us, accordingly, we find that American has failed to establish by a preponderance of the evidence that Reynolds' advertisement "Now. 2 mg 'tar' is lowest" has a tendency to mislead or deceive.

**B.** *The Impact of NOW Advertising on the CARLTON 70's*

The CARLTON 70 is a 1 mg cigarette. Prior to December, 1975 it was a 2 mg cigarette distributed on a test basis in the Baltimore-Washington, D.C. area. Since the reduction of the 70's to a 1 mg tar content American has embarked on a program to establish national distribution, but has done so on a concededly limited scale. By the end of the trial American's figures showed CARLTON 70's to be "found or placed" in about 3.7% of retail stores in the United States.

Reynolds does not dispute that the 70's are lower in tar content than the NOW cigarette. It contends rather 1) that no product is entitled to the protection of the Act until it is distributed to the buyer on what Reynolds terms "more than an insignificant" basis and 2) that in the areas in which the CARLTON 70's have attained such a level, Reynolds' qualified advertisement "Now. 2 mg 'tar' is lowest (king size or longer)" has no tendency to deceive or mislead because, Reynolds claims, the qualifier makes it clear to the reader that the advertisement refers only to cigarettes as large as or larger than king size, and CARLTON 70's are smaller.

■■ Reynolds bases its argument that the Act provides no protection to what it terms "non-viable" products on the trademark doctrine that courts will not grant protection under the Act to marks or names which do not prove substantial established usage. See, e. g., *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265 (2d Cir. 1974) and *Merry Hull & Company v. Hi-Line Co.*, 243 F.Supp. 45

(S.D.N.Y.1965). We need not consider whether the analog of trademarks constitutes an appropriate standard here, however, since in any event the general principle *de minimis non curat lex*—that is, the law is not concerned with minimal matters—may sensibly be applied in the circumstances. Even American does not argue that if it sold only one carton a year of 70's in New York City, the 70's would be entitled to protection under the Act for that period of time. We make no attempt to determine at what level of distribution CARLTON 70's or any other product are entitled to protection under the Act. Indeed there is no evidence in the record upon which such a determination can be made. We hold only that a product is entitled to such protection upon reaching a level of viability in the market place, and that Reynolds' actual recognition of that entitlement when the 70's achieved a retail distribution of 5% in various defined markets is not so unreasonable as to warrant injunctive relief against it.

■ The question nevertheless remains whether Reynolds' qualified current advertisement tends to deceive vis-a-vis CARLTON 70's: that is, does the message: "Now. 2 mg 'tar' is lowest (king size or longer)" create the impression that there is no cigarette lower in tar. As we have observed above, there is simply no evidence of customer reaction in the record on which this question can be determined. We may observe, however, that the qualifier "king size or longer" at least suggests that there may be a smaller size cigarette as to which the assertion does not apply. In any event, we conclude that American has failed to establish by a preponderance of the evidence that the qualified NOW advertisement tends to deceive vis-a-vis CARLTON 70's.

C. *Residual Effects of NOW's Original Advertising*

We noted above that before the suit was brought the text of Reynolds' advertisement was "Now. The lowest tar of all cigarettes." In accordance with normal business practice, Reynolds entered into contracts for the purchase of advertising space in magazines and on billboards for periods of weeks and months in advance. Testimony establishes that the magazine advertising, the last of which appeared very recently in national magazines, will not recur. However, there will remain on display throughout the country until about June 1st various "old text" NOW billboard advertisements.

■ While we do not agree with American that Reynolds could reasonably have been called upon to rearrange its magazine advertising so as to have eliminated the residual effects of the "old text" advertising (which was placed originally in good faith at a time when NOW was the lowest tar cigarette in national distribution), we do agree that Reynolds should presently be required to remedy the residual situation with regard to billboards. Such displays, whether large or small in number, continuously pump out to the passerby a message which more than two months ago became untrue. There is no reason in equity why that message should continue to be disseminated. Accordingly, Reynolds is enjoined forthwith to take all steps necessary to paint over or white-out all billboards or other comparable out of home advertising containing the message: "Now. The lowest 'tar' of all cigarettes."

There remains for discussion Reynolds' use of "point of purchase" materials containing the text of its original advertisement. As in the case of magazine and billboard advertising, after the CARLTON 2 mg cigarettes came on the national market in February, Reynolds' statement that NOW was lowest in tar of all cigarettes became untrue as to such point of purchase materials. We are persuaded that it has undertaken in good faith to eliminate such materials; but proof was tendered at trial by American which established that in some instances residual use of the untrue material still occurs. No justification exists for the use of such material and, accordingly, Reynolds is also enjoined forthwith to assure the discontinuance of any point of pur-

chase material bearing the original message: "Now. The lowest 'tar' of all cigarettes."

## III.

### Reynolds' Counterclaim

A. *The Claim that CARLTON is "fastest growing of the top 25."*

CARLTON's advertisements include the phrase "no wonder CARLTON is fastest growing of the top 25." This claim is based on figures set forth in the so-called Maxwell report which is issued quarterly and is generally regarded as authoritative in the industry. Although Reynolds does not deny the authoritative position of Maxwell, it nevertheless contends that American's claim is false for two reasons: 1) that the Maxwell report upon which the claim is founded is based on data collected prior to February, 1976, at which time CARLTON 83 mm cigarettes had a tar content of 4 mg (CARLTON 4's), and the present CARLTON 83 mm cigarettes (CARLTON 2's) are different cigarettes than the 4's and 2) that the Maxwell report shows a faster rate of growth for Reynolds' MORE cigarettes than the CARLTON 4's or 2's.

■ We agree with American that Reynolds has not established by a preponderance of the evidence that the CARLTON "2's" are a "different" cigarette than the CARLTON 4's to such an extent that statistical data as to the 4's contained in the Maxwell report cannot honestly be utilized in advertising the CARLTON 2's. To be sure there are differences between the 2's and 4's as between any two classes of objects, the most notable of which is the difference in tar content itself; and Reynolds did establish differences in puff count, filter construction and, to some extent, tobacco blend. But Reynolds conducted no comparative taste tests of the 2's and 4's, whereas American did. Although we recognize that testimony by American-employed witnesses as to American-made tests must be taken with caution on this subject, nevertheless we found that testimony to be credible and persuasive. (Tr. 712–32) In brief, we find that the taste of CARLTON

2's is approximately the same as that of CARLTON 4's and that Reynolds has not established that CARLTON 2's and 4's are "different" in relation to the subject at hand.

■ As to Reynolds' contention that because its MORE cigarette has achieved a sales level of 4.7 billion in 1975 American's claim that its CARLTON is "the fastest growing of the top 25" is false, we agree with American that the comparison of the Maxwell report figures on these two brands is inappropriate. As explained by Robert Heimann, Chairman and President of American Brands, the level of 4.7 billion of MORE cigarettes, which were put on the market for the first time in 1975, is a "pipe line load," or "the front end load" of the cigarettes in the year of their introduction and does not establish that that many cigarettes have been sold or that that level of consumption is a dependable annual rate. (Tr. 103–07)

The issue as to whether American's use of the phrase "the fastest growing of the top 25" is permissible is in any event imminently moot. The Maxwell report for the first quarter of 1976 is expected to be issued within a matter of days. American will, of course, be obligated to amend its advertising on the point in question if the new Maxwell report does not justify its position.

■ Reynolds makes several other claims of false advertising by American: that, the 70's are advertised in a layout similar to the 2's so that the impression is created that the phrase, "the lowest tar of all cigarettes", literally true for 70's, is also true of CARLTON 2's; that the advertisement for CARLTON 70's is deceptive because the package depicted appears to be larger than it actually is; that the reference in CARLTON advertisements to other brands of low tar cigarettes is deceptive because it purposely omits reference to NOW cigarettes and creates the impression that CARLTON is the only 2 mg cigarette; and that American has misled customers by selling CARLTON 2's and 4's interchangeably (a proposition which is now moot because the stock of 4's has been depleted).

As to these allegations the observation which we made as to American's claims is equally applicable: that is, Reynolds has submitted no evidence whatsoever as to customer reaction to these messages or practices and we find that it has failed to establish its claim by a preponderance of the evidence.

Two further general observations apply both to American's claim and Reynolds' counterclaim. First, Reynolds argued at trial, and we agree, that all of the advertisements in question must be judged in the context of the market place and particularly in the context of the publications in which they appear. We take judicial notice of the fact that today's newspapers, magazines and other forms of advertisement are rife with the message of low tar content in cigarettes, and find that because of such profusion it is substantially less likely that any reader having an interest in the subject will be misled by the messages before us; especially since the actual tar and nicotine content of the product advertised appears to be specified in every advertisement. Readers who do not have an interest may be misled but are unlikely to be consumers.

Finally, we believe it to be of some significance that neither American nor Reynolds has proffered any evidence that it has been damaged by loss of sales as a result of the advertising of its competitor-opponent. If the dire analysis which each of the parties predicates as to the advertising of the other were true, it seems reasonable to believe that evidence of damage would exist. Perhaps it is too early in this phase of the battle of the Titans for such material to be at hand. Yet we must go on the facts before us and the state of the record as it is.

### CONCLUSION

For the reasons stated above, American's prayer for injunctive relief is granted to the extent of enjoining Reynolds 1) to paint over or white-out all existing billboards or other comparable uses of out of home advertising and 2) to use every effort by the employment of its sales force to withdraw from use any point of purchase material which includes the words "Now. The lowest 'tar' of all cigarettes." American's complaint is otherwise dismissed. Reynolds' prayer for injunctive relief is denied and its counterclaim is dismissed.

It is so ordered.